MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2014 ME 67
Docket:        BCD-12-368
Argued:        September 11, 2013
Decided:       May 15, 2014

Panel:         SAUFLEY, C.J., and ALEXANDER, LEVY,<sup>*</sup> SILVER, MEAD, GORMAN, and JABAR, JJ.

Majority:      ALEXANDER, SILVER, GORMAN, and JABAR, JJ.

Concurrence/
   Dissent:    SAUFLEY, C.J. and MEAD, J.


NORTH ATLANTIC SECURITIES, LLC, et al.

v.

OFFICE OF SECURITIES


ALEXANDER, J.

[¶1] North Atlantic Securities, LLC; Michael J. Dell'Olio & Associates, LLC; and Michael J. Dell'Olio appeal from a judgment entered in the Business and Consumer Docket (*Nivison, J.*) affirming the revocation of each of their securities licenses by the Securities Administrator of the Office of Securities. The revocations resulted from transactions in 2006 and 2008 through which Dell'Olio, his son, and the entities under Dell'Olio's control received more than $200,000 in

---

<sup>*</sup>  Levy, J., sat at oral argument and participated in the initial conference but resigned before this opinion was adopted.

loans from Dell'Olio's elderly mother-in-law,[1] who was a client. Most of the loans were not repaid. The companies and Dell'Olio argue that charges arising from the 2006 transactions were time-barred, the administrative record fails to support the Administrator's factual findings, the administrative process and the Administrator herself were biased, and the penalty imposed was excessive. We affirm the judgment.

## I. STATUTORY AND REGULATORY FRAMEWORK

[¶2] The Maine Uniform Securities Act, 32 M.R.S. §§ 16101-16702 (2013),[2] includes licensing requirements for broker-dealers,[3] agents,[4] investment advisers,[5] and investment adviser representatives[6] who deal in securities, *id.*

---

[1] At the time of the administrative hearing in October 2011, Dell'Olio's mother-in-law was ninety-two years old.

[2] Although there have been statutory amendments to these sections since the alleged misconduct, *see, e.g.,* P.L. 2013, ch. 39 (effective Oct. 9, 2013) (codified at 32 M.R.S. §§ 16409, 16508(1), 16604(4) (2013)), the pertinent statutory language is unchanged, and we cite to the current statutes.

[3] A broker-dealer is "a person engaged in the business of effecting transactions in securities for the account of others or for the person's own account." 32 M.R.S. § 16102(4) (2013).

[4] An agent is "an individual, other than a broker-dealer, who represents a broker-dealer in effecting or attempting to effect purchases or sales of securities or represents an issuer in effecting or attempting to effect purchases or sales of the issuer's securities." 32 M.R.S. § 16102(2) (2013).

[5] An investment adviser is "a person that, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or the advisability of investing in, purchasing or selling securities or that, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities." 32 M.R.S. § 16102(15) (2013).

§§ 16401-16411, and authorizes disciplinary action against licensees to protect the public interest, including by revoking or suspending a license, *id.* § 16412. The Securities Administrator of the Office of Securities is responsible for determining whether discipline should be imposed. *Id.* §§ 16102(1), 16412, 16601(1). A broker-dealer, agent, investment advisor, or investment advisor representative may be disciplined for, within the previous ten years, "engag[ing] in unlawful, dishonest or unethical practices in the securities, commodities, investment, franchise, banking, finance or insurance business" or failing to reasonably supervise a person under its supervision. *Id.* § 16412(4)(I), (M).

[¶3] "If the administrator finds that the order is in the public interest and subsection 4 authorizes the action, an order issued under [the Maine Uniform Securities Act] may revoke, suspend, condition or limit the license of a licensee." *Id.* § 16412(2). Before entering such a disciplinary order, the Administrator must provide "[a]ppropriate notice to the applicant or licensee," afford an "[o]pportunity

---

[6] Investment adviser representatives are

individuals employed by or associated with an investment adviser or federal covered investment adviser and who make any recommendations or otherwise give investment advice regarding securities, manage accounts or portfolios of clients, determine which recommendation or advice regarding securities should be given, provide investment advice or hold themselves out as providing investment advice, receive compensation to solicit, offer or negotiate for the sale of or for selling investment advice or supervise employees who perform any of the foregoing.

32 M.R.S. § 16102(16) (2013).

4

for hearing," and reach "[f]indings of fact and conclusions of law in a record in accordance with Title 5, chapter 375 [the Maine Administrative Procedure Act]." *Id.* § 16412(7); *see also* 5 M.R.S. §§ 9051-9064 (2013) (governing administrative agencies' adjudicatory proceedings).

A.    Broker-Dealer and Broker-Dealer Agent

[¶4]   North Atlantic was licensed as a broker-dealer and Dell'Olio as a broker-dealer agent at all relevant times. *See* 32 M.R.S. § 16102(2), (4).  The rules adopted by the Administrator pursuant to 32 M.R.S. § 16605 (2013) and in effect at the relevant times required broker-dealers and their agents to "observe high standards of commercial honor and just and equitable principles of trade in the conduct of their business" and to "give particular consideration to any conflicts of interest that may arise or exist."  6 C.M.R. 02 032 504-5 § 8 (2006).  This rule included a list of practices deemed to be unethical but stated clearly, "This section is not intended to be all inclusive, and thus practices not enumerated herein may also be deemed dishonest or unethical." *Id.*  Relevant here, the rule provided:

> A person may be deemed to have engaged in "dishonest or unethical practices" under Section 16412(4)(M) of the Act if the person has engaged in practices including but not limited to one or more of the following:
>
> . . .

36. As an agent, lending money or securities to, or borrowing money or securities from, a customer, or acting as a custodian for money, securities or an executed stock power of a customer, unless:

    A. The broker-dealer has written procedures allowing such an arrangement; and

    B. The customer is:

    (1) a member of the agent's immediate family or another person whom the agent supports, directly or indirectly, to a material extent.

6 C.M.R. 02 032 504-5, -7 § 8 (2006, 2009).

[¶5] The Financial Industry Regulatory Authority (FINRA), the independent federal regulator responsible for overseeing securities firms including North Atlantic, also has a set of rules that imposes responsibilities similar to those of the Maine statutes and regulations. Pursuant to FINRA rules, a securities firm "in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade." FINRA Rule 2010 (2013).[7]

[¶6] Both the FINRA Rules in effect in 2006 and the current rules prohibit regulated persons and entities from borrowing money from or lending money to customers, except in defined circumstances, such as when the firm "has written

---

[7] The quoted language is the current language, which incorporates an August 1, 2006, amendment to make the rule gender neutral, *see* 71 Fed. Reg. 38,935, 38,948 (July 10, 2006); Sec. & Exch. Comm'n, File No. SR-2005-087, amend. 1 at 395, Proposed Rule Change by National Association of Securities Dealers, and a December 15, 2008, amendment in which it was renumbered, *see* 73 Fed. Reg. 57,174, 57,176-77 (Oct. 1, 2008). In substance, this rule has not changed since the events of this case.

procedures allowing the borrowing and lending of money between such registered persons and customers of the member," *and* "the customer is a member of such person's immediate family," which is defined to include a mother-in-law. FINRA Rule 2370(a), (c) (effective Feb. 18, 2004), *repealed and replaced by* FINRA Rule 3240(a), (c) (2013) (effective June 14, 2010) (replacing former Rule 2370 without any change in the language at issue here). The written procedures to which this rule refers are written supervisory procedures that a member must annually certify it has in place; the procedures must be "reasonably designed to achieve compliance with applicable FINRA rules, MSRB [Municipal Securities Rulemaking Board] rules and federal securities laws and regulations." FINRA Rule 3130(b) (2013).

B. Investment Adviser and Investment Adviser Representative

[¶7] Michael J. Dell'Olio & Associates is an investment adviser, *see* 32 M.R.S. § 16102(15), and Dell'Olio individually is an investment adviser representative, *see id.* § 16102(16). The applicable rules adopted by the Administrator provided, "Investment advisers and investment adviser representatives are fiduciaries and have a duty to act for the benefit of their clients." 6 C.M.R. 02 032 515-15 § 14 (2009). The rule prohibited an investment adviser or investment adviser representative from "engag[ing] in dishonest or unethical business practices," and listed "examples of practices that may constitute grounds for discipline as 'dishonest or unethical practices' under Section 16412 of the Act."

*Id.* One listed example is "[b]orrowing money or securities from a client unless the client is a broker-dealer, an affiliate of the investment adviser, or a financial institution engaged in the business of loaning funds." 6 C.M.R. 02 032 515-15 § 14(6) (2009).[8] As with the rule governing the conduct of broker-dealers and their agents, "[t]his section is not intended to be all inclusive, and thus practices not enumerated herein may also be deemed dishonest or unethical." *Id.* § 14.

## II.  CASE HISTORY

[¶8]   In 2002, Michael J. Dell'Olio & Associates became a licensed investment adviser with the Office of Securities.  North Atlantic became licensed as a broker-dealer with the Office in 2003 and later shared a business location with Michael J. Dell'Olio & Associates.  Dell'Olio individually was an agent of North Atlantic, an investment adviser representative of Michael J. Dell'Olio & Associates, and an owner exercising control in both firms.

[¶9]   In June 2006, Dell'Olio borrowed $20,000 from his mother-in-law. She had been a brokerage and investment advisory client of Dell'Olio and his firms since 2003.  Dell'Olio borrowed the money in part to help North Atlantic meet its

---

[8]  The rule included no definition of the term "affiliate" for purposes of this section.  *Cf.* 6 C.M.R. 02 032 515-6 § 7(1)(L)(4)(a) (2009) (defining the term "affiliated person" but only "[f]or the purposes of this paragraph").

8

obligations. However, he retained $8,250 from the loan to pay for work he performed in renovating a house owned by his wife.

[¶10]   Dell'Olio created a payment schedule and made seven monthly payments of $631.  He then stopped paying, leaving a balance of $15,583.

[¶11]   At the time of these transactions, the written supervisory procedures that North Atlantic had in place provided:

*Financial Relationships With Clients*

> Under no circumstances may a RR [Registered Representative] engage personally in any type of financial relationship or arrangement outside of the established the Firm structure. *Prohibited practices include*, but are not limited to: (a) Pooling funds for investment purposes with a client; (b) *Lending to or borrowing from a client*; (C) Participating in the profits or losses in a client's account or agreeing to repurchase a client's security or contract; (E) Acting as agent for a client in arranging a bank loan or any other transaction not directly part of the Firm's business; (F) Engaging in private securities transactions; and (G) Agreeing to rebate or share any portion of RR compensation with any other person or organization.

(Emphasis added.)

[¶12]   In April 2008, when she was still a client of North Atlantic, Dell'Olio persuaded his mother-in-law to lend his son $150,000 for the purchase of a building where Dell'Olio's firms could do business.  He established a non-purpose loan account in his mother-in-law's name with North Atlantic's clearing firm, Pershing, secured by the value of her securities.  His mother-in-law borrowed

$150,000 using the Pershing loan account and wired the money to a bank account held by Delmore Associates, LLC, whose sole member was Dell'Olio's son.

[¶13] Dell'Olio's son, using $94,000 of the money Dell'Olio received from his mother-in-law ($10,000 of which was used to repay Dell'Olio for earlier supplying earnest money) and a mortgage loan from a bank, purchased the building that came to house Dell'Olio's firms. The remaining $56,000 in proceeds from the non-purpose loan was used for other purposes, including depositing $4,718 into a retail brokerage account of Michael J. Dell'Olio & Associates and using $10,263 to pay off Dell'Olio's car loan.

[¶14] Due to personal financial difficulties, during the second half of 2008, Dell'Olio, on five separate occasions, borrowed more money from his mother-in-law through her Pershing non-purpose loan account. On at least three of these five occasions, Dell'Olio cut and pasted a copy of his mother-in-law's signature rather than obtaining from her a signature authorizing additional borrowing. At the time of these events, the written supervisory procedures for North Atlantic provided:

*Forgery*

> Signing the name of a client to any document constitutes forgery. All such occurrences, which come to the attention of The Firm, must be reported to FINRA and will lead to severe disciplinary action against the employee.

> Regardless of intention—whether authorized by the client or done for the client's convenience—no employee may sign a client's name to any document.

[¶15]   Ultimately, through the five additional transactions, $47,000 was drawn from the Pershing loan account and wired to Delmore.  From there, more than $18,000 was disbursed to checking or brokerage accounts of Dell'Olio or Michael J. Dell'Olio & Associates.  The remaining funds were used to cover business expenses of North Atlantic and Michael J. Dell'Olio & Associates.

[¶16]   Although a few thousand dollars were returned to the non-purpose loan account in June 2008, no repayments were made to Dell'Olio's mother-in-law until January 2010.  Only $14,000 was repaid at all.  To maintain sufficient collateral in the non-purpose loan account, Dell'Olio's mother-in-law had to sell or encumber other securities that she owned.

[¶17] On June 10, 2011, the Office of Securities issued a notice of intent to issue an order revoking or suspending the licenses of North Atlantic, Michael J. Dell'Olio & Associates, and Dell'Olio.  The notice gave explicit warning of the sanctions anticipated if violations were found: "The Securities Administrator intends to issue an order revoking or suspending the licenses of [the three entities]; censuring each of them; barring each of them from associating with any broker-dealer, investment adviser, or issuer in Maine; and imposing a civil penalty of $5,000 per violation on each of them."  The notice was signed by the Securities

Administrator and provided a thirty-day deadline to request a hearing to address the alleged violations and anticipated sanctions.

[¶18]  Dell'Olio and his companies filed a timely request for a hearing and then moved for the Administrator to disqualify herself on the ground that she had been involved in investigating them.  The Administrator denied the motion to disqualify on the grounds that she had had no role in the investigation and had signed the notice of intent as required by statute, *see* 32 M.R.S. § 16412(7), without looking at any of the evidence that the Office of Securities staff had gathered.  The Administrator scheduled a hearing on the alleged violations and anticipated sanctions for October 2011.

[¶19]  The Administrator served as the hearing officer and accepted voluminous exhibits during a two-day hearing held on October 26 and November 7, 2011.  Three examiners from the Office of Securities testified, as did Dell'Olio, the chief operating officer of North Atlantic in 2006, and the attorney who represented North Atlantic until May 2011.

[¶20]  Dell'Olio and his companies had been subject to a 2006 investigation by the Office of Securities.  During that 2006 investigation, Dell'Olio's son had provided written supervisory procedures to the Office that included the prohibition against borrowing from clients quoted in paragraph 11.  In 2009, during the investigation that led to the order now under review, Dell'Olio had provided the

12

Office with a different set of written supervisory procedures that he contended were the correct set. This later-offered set had the same date in the running footer but included a family-member exception to the prohibition against borrowing from a client.

[¶21] To controvert Dell'Olio's assertion that the written supervisory procedures provided in 2009 were in place when the relevant events occurred in 2006 and 2008, the Office offered a fax that Dell'Olio sent to the Maine Governor's Office on May 2, 2011. In that fax, Dell'Olio stated,

> In *2008*, after a recommendation by the FINRA auditor, the firm changed the procedures to conform more closely with the FINRA rule. The provision as revised states as follows:
>
> > Under no circumstances may a RR engage personally in any type of financial relationship or arrangement outside of the established the Firm structure. Prohibited practices include, but are not limited to: . . . (b) Lending to or borrowing from a client, *unless the client is an immediate family member, registered member of the same broker dealer or a financial institution* . . . .

(Emphasis added.)

[¶22] North Atlantic's chief operating officer testified that the version containing the family-member exception must have been the one in effect when all of the transactions took place. However, the Administrator later found that testimony to be speculative.

## III. PROCESS LEADING TO DECISION

[¶23] After the close of the hearing, the parties were invited to file written arguments addressing both (i) the sufficiency of proof of the alleged violations of law and regulations, and (ii) the sanctions that would be appropriate depending on the violations found by the Administrator. The process employed was similar to that in other professional disciplinary proceedings when a hearing is conducted and the parties are then given the opportunity to present closing arguments or file written memoranda addressing both the evidence of violations and the sanctions that might be appropriate if violations are found, with the resulting decision then finding violations proven or not, and, if violations are found, imposing sanctions. *See for example Zablotny v. State Board of Nursing*, 2014 ME 46, ¶ 7, --- A.3d --- (April/May 2010 hearing, June 2010 administrative decision finding violations and imposing professional discipline and monetary sanctions); *Lippitt v. Bd. of Certification of Geologists and Soil Scientists*, 2014 ME 42, ¶¶ 8, 11, 12, --- A.3d --- (June 2010 hearing, August 2010 administrative decision finding violations and imposing professional discipline and monetary sanctions); *Michalowski v. Bd. of Licensure in Medicine*, 2012 ME 134, ¶¶ 6-7, 58 A.3d 1074 (April/July 2010 hearing, September 2010 administrative decision finding violations and imposing professional discipline and monetary sanctions). *See also* M.R. Civ. P. 80G(b) mandating that court complaints seeking professional

licensing discipline "must allege the violation of a cited statute or rule and the relief requested" so that parties are on notice that the violation claimed and the sanction sought are at issue in a combined proceeding.

[¶24] The combination of consideration of professional conduct violations and sanctions in a single hearing and advocacy process with a subsequent decision addressing both issues enables a relatively efficient resolution of what has often been an extended and expensive administrative review process. It avoids the further cost and delay that would be inherent in any process that would require separate, subsequent consideration of sanctions, after resolution of violation issues, but before any appeals. Here, the investigation began in 2009, the notice of intent to revoke or suspend issued in June 2011, the hearing was held in the fall of 2011, and the Administrator's decision issued in February 2012. Further delay for an additional sanctions hearing would likely have delayed final resolution of the matter at the administrative level to three-and-a-half years, or longer, since the investigation had begun.

[¶25] In this case, the hearing was completed on November 7, 2011; the parties' arguments addressing both the alleged violations and possible sanctions were due and filed by December 9, 2011. Both parties were then allowed to file rebuttal arguments by December 23, 2011. The staff of the Office of Securities did

so. Dell'Olio and the related respondents did not file their rebuttal arguments until January 17, 2012.

[¶26] In their post-hearing memoranda, the staff addressed both violations and sanctions in considerable detail, arguing for revocation of the securities licenses. Dell'Olio and the related respondents argued that they had done little, if anything, wrong and asserted that the proceedings against them should be dismissed. Although given the opportunity to do so in both their original and rebuttal memoranda, Dell'Olio and the related respondents gave relatively little attention to possible sanctions.

[¶27] The Administrator issued her decision on February 2, 2012.[9] Following that decision, Dell'Olio did not file any request for further findings or any motion for reconsideration. The petition for review to the Superior Court was filed February 9, 2012.

## IV. THE ADMINISTRATOR'S DECISION

[¶28] In a twenty-nine-page decision that extensively addressed the issues raised at hearing, the Administrator found that the written supervisory procedures provided in 2006 were the procedures in effect until September 2008. Thus, most

---

[9] The decision was dated February 2, 2011. Electronic coding on the decision indicated that it was "Filed 02/02/2012."

of the money was borrowed before the family-member exception to the borrowing prohibition, was incorporated into the written supervisory procedures.[10]

[¶29]   The Administrator determined that North Atlantic, Michael J. Dell'Olio & Associates, and Dell'Olio committed unlawful, dishonest, or unethical practices by (1) borrowing from a client when the written supervisory procedures of the office did not permit such loans; (2) using loan proceeds for purposes other than the intended purpose; (3) creating authorization letters that bore forged, cut-and-pasted signatures; and (4) making false statements under oath to the Office of Securities during the disciplinary proceeding.  *See* 32 M.R.S. § 16412(4)(I), (M), (8); 6 C.M.R. 02 032 504-5, -7 § 8(36); 6 C.M.R. 02 032 515-15 § 14(6); FINRA Rule 2010; FINRA Rule 2370(a), (c) (effective Feb. 18, 2004), *repealed and replaced by* FINRA Rule 3240(a), (c) (2013) (effective June 14, 2010).   The Administrator ordered that the securities licenses of North Atlantic, Michael J. Dell'Olio & Associates, and Dell'Olio be revoked.

[¶30]  As indicated above, Dell'Olio and the companies promptly petitioned for Superior Court review of final agency action.  *See* 5 M.R.S. § 11002 (2013); 32 M.R.S. § 16609 (2013); M.R. Civ. P. 80C.  The matter was accepted for transfer to the Business and Consumer Docket.  After receiving briefs and hearing oral

---

[10]  The updated written supervisory procedures were in place only when the final four transactions occurred between October and December 2008; those transactions accounted for $32,000 in loans.  The forgery provision was in place throughout and did not change in any way.

arguments, the court entered a judgment affirming the decision of the Administrator. Dell'Olio and the companies timely appealed to us. *See* 5 M.R.S. § 11008 (2013); M.R. Civ. P. 80C(m).

## V. LEGAL ANALYSIS

[¶31]    Dell'Olio and the companies raise four issues: (A) whether the Office's allegations about the 2006 transaction were time-barred, (B) whether the record supports the Administrator's findings, (C) whether the decision must be vacated because it was tainted by structural or actual bias, and (D) whether the Administrator abused her discretion by imposing such severe penalties.[11]

[¶32]    At no point before the Administrator, before the trial court, or before us did Dell'Olio suggest, as addressed in the concurring and dissenting opinion, that the proceedings before the Administrator should have been bifurcated with the violation issues decided first and the sanctions then decided in a separate, subsequent proceeding. That issue is not preserved for our review, and it cannot be noticed as obvious error in light of our recent opinions, cited above, and M.R. Civ. P. 80G(b), accepting and anticipating processes that consider violations and sanctions in a single proceeding leading to a single final decision addressing both issues.

---

[11]  To the extent that Dell'Olio raised other challenges, we are unpersuaded and do not discuss them further.

18

A.      Were Allegations About the 2006 Transaction Time-barred?

[¶33]   We interpret statutes de novo to give effect to the intent of the Legislature based on the plain meaning of the statute.  *Michalowski*, 2012 ME 134, ¶ 11, 58 A.3d 1074; *Cobb v. Bd. of Counseling Prof'ls Licensure*, 2006 ME 48, ¶ 11, 896 A.2d 271.   At issue here is a time limitation on the institution of proceedings based on when the Administrator had actual knowledge of the material facts:

> **Limit on investigation or proceeding.**  The administrator may not institute a proceeding under subsection 1, 2 or 3 based solely on material facts actually known by the administrator unless an investigation or the proceeding is instituted within one year after the administrator actually acquires knowledge of the material facts.

32 M.R.S. § 16412(9).

[¶34]  Although Dell'Olio and the companies argue that the material facts in this matter were known to the Office by October 2006, evidence in the record supports the Administrator's finding that, when he was questioned in 2006, Dell'Olio told investigators that an August 4, 2006, payment to his mother-in-law constituted reimbursement for building materials.  Because the payments had just begun and the schedule of payments had not been supplied, the investigator could not reasonably have known that Dell'Olio was making a loan payment. Accordingly, the Office did not actually acquire knowledge of the material facts until the later investigation, within one year of when the notice of intent was issued.

*See id.* The administrator did not err in determining that the matter is not time-barred.

B.   Does the Administrative Record Support the Administrator's Factual Findings?

[¶35]  Dell'Olio and the companies contend that the 2006 transaction was not a loan; that the 2008 transaction constituted a loan to Dell'Olio's son, not to any named respondent; that the written supervisory procedures presented to the Administrator in 2009 permitted loans to family members; and that Dell'Olio did not violate any legal or ethical obligation by using his mother-in-law's signature with her authorization.

[¶36]  The Administrator's findings are supported by substantial evidence in the record.  Based on those findings, the Administrator reached the ultimate findings that Dell'Olio and his entities engaged in unlawful, dishonest, or unethical practices by borrowing money from a client both directly and indirectly through Dell'Olio's son, using the money from one loan for purposes other than the express purpose for which the loan was intended, creating and submitting letters bearing forged signatures in violation of the written supervisory procedures then in place, and making false statements under oath to the Office of Securities.  These findings have evidentiary support and will be affirmed notwithstanding the existence of contrary evidence in the administrative record.  *See Dyer v. Superintendent of Ins.*,

2013 ME 61, ¶ 14, 69 A.3d 416 (stating that we defer to an agency's findings if supported by substantial evidence in the record even if the record contains inconsistent or contrary evidence).

[¶37]  Based on the findings that the Administrator reached, she could conclude that the broker-dealer (North Atlantic) and the broker-dealer agent (Dell'Olio) violated their obligations to maintain high ethical standards, *see* 6 C.M.R. 02 032 504-5 § 8; FINRA Rule 2010; that Dell'Olio violated the regulatory provision prohibiting a broker-dealer agent from borrowing from a customer when the broker-dealer's written procedures did not allow for loans from immediate family members, *see* 6 C.M.R. 02 032 504-5, -7 § 8(36); and that North Atlantic similarly failed to comply with the FINRA Rule allowing for family loans only when "the member has written procedures allowing the borrowing and lending of money between such registered persons and customers of the member," FINRA Rule 2370(a).

[¶38]  Michael J. Dell'Olio & Associates, the investment adviser, and Dell'Olio individually, as an investment adviser representative for that company, could also be found to have "engage[d] in dishonest or unethical business practices," by borrowing money or securities from a client and using forged signatures.  6 C.M.R. 02 032 515-15 § 14.  Furthermore, although North Atlantic's written supervisory procedures may not have applied to Michael J. Dell'Olio

& Associates or to Dell'Olio as an investment adviser representative, the practices for which North Atlantic was penalized could also constitute punishable dishonest or unethical practices committed by an investment adviser and its representative. *See id.* The Administrator's findings are supported by the record and her decision, based on those findings, does not indicate any error of law.

C.      Was the Administrator's Decision Affected by Structural or Actual Bias?

1.      Structural Bias

[¶39]  Dell'Olio and the companies argue that there is structural bias in the statutory notice-of-intent procedure because at the outset of proceedings, the Administrator identifies penalties that may automatically be imposed unless the respondent challenges them.  They contend that this procedure renders the Administrator inherently biased when she later hears the matter upon a respondent's challenge.  In essence, Dell'Olio and the companies regard the notice of potential penalties, intended to convey the serious nature of the proceedings, as an indication of possible prejudgment by the Administrator.  We are not persuaded by this argument.

[¶40]  The notice complained of here is similar to the notice required in court initiated professional licensing disciplinary proceedings that mandate identification of "the relief requested," usually license suspension or revocation, in the complaint initiating the proceeding.  M.R. Civ. P. 80G(b).  A holder of a

professional license has a property interest in that license.  *Balian v. Bd. of Licensure in Med.*, 1999 ME 8, ¶ 11, 722 A.2d 364.  Thus, the license may not be revoked without complying with the dictates of due process.  *See id.* ¶¶ 10-11.  "It is essential to a party's right to procedural due process that he be given notice of and an opportunity to be heard at any proceeding in which such property rights are at stake." *Senty v. Bd. of Osteopathic Examination & Registration*, 594 A.2d 1068, 1072 (Me. 1991).  "An administrative process may be infirm if it creates an intolerable risk of bias or unfair advantage." *Zegel v. Bd. of Soc. Worker Licensure*, 2004 ME 31, ¶ 16, 843 A.2d 18.

[¶41]  Here, the Administrator served on North Atlantic a notice of intent to revoke or suspend its license unless a hearing was requested.  The statute in place requires that the Office of Securities offer the opportunity for a hearing:

> **Procedural requirements.**  An order may not be issued under this section, except under subsection 6 [providing for a summary process in certain instances], without:
>
> **A.** Appropriate notice to the applicant or licensee;
>
> **B.** Opportunity for hearing; and
>
> **C.** Findings of fact and conclusions of law in a record in accordance with Title 5, chapter 375.

32 M.R.S. § 16412(7).  The applicable Office of Securities regulation adds, "In accordance with 5 M.R.S.A. § 9053(3), the Administrator or presiding officer may

dispose of an adjudicatory proceeding by default against any party that fails to timely request a hearing . . . ." 6 C.M.R. 02 032 540-5 § 19(1) (2006). Title 5 M.R.S. § 9053(3) (2013) provides that an agency may, unless otherwise provided by law, "[m]ake informal disposition of any adjudicatory proceeding by default, provided that notice has been given that failure to take required action may result in default, and further provided that any such default may be set aside by the agency for good cause shown."

[¶42] North Atlantic's structural due process challenge rests on the wording of the notice of intent, which states that the Administrator "intends to issue an order" of revocation or suspension and that "[f]ailure to request a hearing in writing within thirty (30) calendar days of the date of this Notice of Intent will result in a waiver of the right to a hearing." Despite the wording declaring an intention on the part of the Administrator, however, this provision serves to inform the respondents of the potential consequences of inaction and protects their rights to an opportunity for hearing. The notice is consistent with the statutory and regulatory requirements, and the Office of Securities procedures do not violate due process because they do not generate any risk of bias but rather employ a common, and constitutional, process by which members of administrative agencies "receive the results of investigations, . . . approve the filing of charges or formal complaints

instituting enforcement proceedings, and then . . . participate in the ensuing hearings." *Withrow v. Larkin*, 421 U.S. 35, 56 (1975).

2.  Actual Bias

[¶43]  Dell'Olio and the companies also argue that the Administrator was biased because she overruled many of their objections, disregarded Dell'Olio's mother-in-law's affidavits, lacked a basis to sanction them for an authorized reproduction of a family member's signature, was swayed by a politically connected complainant (the son of Dell'Olio's mother-in-law), reached her decision for purposes of preserving her predetermination that the licenses should be revoked, and imposed an excessive penalty.

[¶44]  If an entity subject to adjudication by an administrator raises a claim of bias, the entity must offer proof to demonstrate an actual risk of bias or prejudgment in the form of a conflict of interest or some other form of partiality. *Brasslett v. Cota*, 761 F.2d 827, 837 (1st Cir. 1985).  Evidence of actual bias is not present here.  The Administrator's decisions overruling many objections that were founded on inapplicable rules of evidence does not demonstrate bias because, "[u]nless otherwise provided by statute, agencies need not observe the rules of evidence observed by courts."  5 M.R.S. § 9057(1).  Indeed, in the context of counsel's repeated off-point objections and occasionally rude interjections, the Administrator's patience evidenced the opposite of bias.  Similarly, the

Administrator's finding that Dell'Olio committed "unlawful, dishonest or unethical practices," 32 M.R.S. § 16412(4)(M), by repeatedly forging his mother-in-law's signature does not constitute evidence of bias because an adjudicator's decision against a party on disputed issues of law and fact is not, without more, evidence of partiality, *see Copp v. Liberty*, 2008 ME 97, ¶ 12, 952 A.2d 976.

[¶45]  Nor can evidence of bias arise from the Administrator's finding that some evidence was more credible than other evidence.  *See Dyer*, 2013 ME 61, ¶ 14, 69 A.3d 416 (stating that we defer to an agency's findings if supported by substantial evidence in the record even if the record contains inconsistent or contrary evidence).  Determining credibility is solidly the province of the fact-finder.  *See id.* ¶ 12.  Finally, no evidence has been provided to demonstrate that the early involvement of the mother-in-law's son resulted in the Administrator considering or relying on information outside of the administrative record in reaching her decision.

[¶46]  A review of the record shows that a patient Administrator allowed Dell'Olio and the companies to challenge the Office's evidence and present all of the testimony and documentary exhibits that they wished in response to the Office's charges.  The law has been correctly applied, the facts are supported in the record, the decision-maker acted within her discretion in making evidentiary

determinations, and the record is devoid of evidence of institutional or personal bias.

D.     Penalties Imposed

[¶47]  The Office of Securities and the respondents submitted post-hearing memoranda that incorporated their arguments regarding sanctions.   Because Dell'Olio and the companies argued in their closing memorandum that they had done nothing wrong, or that, at worst, Dell'Olio had engaged in a technical violation when he cut and pasted his mother-in-law's signature, the memorandum contained little discussion of appropriate sanctions.

[¶48]  Even in their reply memorandum, despite the explicit request for a full revocation by the Office of Securities in its post-hearing memorandum, Dell'Olio and the companies suggested no meaningful alternative to that proposed sanction. Completely missing from Dell'Olio's reply was any discussion of sanctions that would be appropriate in the event that the Administrator found, as the Office of Securities requested, that Dell'Olio had lied during the hearing and had doctored a critical document.   Accordingly, the Administrator was left with two starkly different arguments on sanctions: the Office of Securities argued that nothing short of revocation would protect the public, particularly given Dell'Olio's willingness

to lie under oath, and Dell'Olio argued that he was essentially blameless such that the notice of intent should be dismissed.[12]

[¶49] It is in this context that we review the Administrator's decision to revoke the licenses. "On appeal of an administrative agency's imposition of a penalty, we review the agency's decision directly for an abuse of discretion, errors of law, or findings not supported by the evidence." *Me. Real Estate Comm'n v. Jones*, 670 A.2d 1385, 1387 (Me. 1996). Having affirmed the factual findings of the Administrator, and in the absence of any legal infirmities in the Administrator's analysis, we review the determination of the penalty for an abuse of discretion.

[¶50] Although we have not construed the penalty provision of the Maine Uniform Securities Act, securities decisions from other jurisdictions that, like Maine, require that a penalty order be "in the public interest," 32 M.R.S. § 16412(2), provide a useful framework for the review of a penalty's propriety. The following non-exclusive factors are among the key guiding factors that have been identified for purposes of determining whether an order should be entered in the public interest: "(1) the egregiousness of the respondent's actions; (2) the isolated or recurrent nature of the infractions; (3) the degree of scienter involved; (4) the sincerity of the respondent's assurances against future violations; (5) the

---

[12] Dell'Olio noted in his initial post-hearing memorandum that others found to have committed only technical violations regarding signatures had been fined or briefly suspended.

28

respondent's recognition of the wrongful nature of his or her conduct; and (6) the likelihood that his or her occupation will present opportunities for future violations." *Westmark Asset Mgmt. Corp. v. Joseph*, 37 P.3d 516, 519 (Colo. App. 2001) (citing *Steadman v. Sec. & Exch. Comm'n,* 603 F.2d 1126, 1140 (5th Cir. 1979), *aff'd on other grounds,* 450 U.S. 91 (1981)).[13] Although several of these identified guiding factors relate to the nature and extent of the misconduct, the others are designed to gauge the trustworthiness and honesty of the licensed individuals and entities to determine what type of sanction or sanctions would best protect the public.

[¶51]　The type of sanction imposed here is the most serious penalty available, other than a permanent revocation that would bar any future reapplication for a license.　Revocation is a substantial penalty, especially when corporate entities' fates may determine the livelihoods of all who are employed in

---

[13]　We have taken into account similar factors in reviewing sanctions imposed against other professionals for their misconduct. *See Dyer v. Superintendent of Ins.*, 2013 ME 61, ¶¶ 10, 21, 69 A.3d 416 (affirming the imposition of maximum civil penalties on an insurance producer based on the seriousness and quantity of violations); *Bankers Life & Cas. Co. v. Superintendent of Ins.*, 2013 ME 7, ¶ 18, 60 A.3d 1272 (affirming the imposition of a civil penalty on an insurance company when the company was on notice at the time of the misconduct that its process for determining the suitability of products for sale to customers had been failing); *Bd. of Overseers of the Bar v. Murphy*, 570 A.2d 1212, 1213 (Me. 1990) (affirming an attorney's disbarment for deliberately committing multiple violations of the Maine Bar Rules); *Bd. of Overseers of the Bar v. Dineen*, 557 A.2d 610 (Me. 1989) (affirming an attorney's disbarment for multiple instances of neglecting clients' cases and failing, after his suspension, to comply with the requirement that he file an affidavit with the Court and the Board of Overseers of the Bar attesting that he had notified clients and others of the suspension).

their offices. The penalty of revocation must be reserved for some of the most serious circumstances, taking into account all relevant factors.

[¶52] The Administrator's decision to impose that sanction here was primarily based on her findings regarding two separate courses of conduct: (1) the conduct originally complained of, that is, Dell'Olio's and the companies' treatment of their client, Dell'Olio's mother-in-law; and (2) Dell'Olio's and the companies' conduct during the investigation and hearing, which included the making of "false statements to the Office of Securities."

[¶53] Regarding the first course of conduct, because the client herself—Dell'Olio's mother-in-law—does not appear to have objected to the conduct or sought any sanctions, a license revocation may appear to be harsh. *See* Uniform Securities Act § 412 cmt. 2, *included with* 32 M.R.S.A. § 16412 (Supp. 2013) ("The public interest will not require imposition of a sanction for every minor technical violation . . . ."). The Office of Securities conceded that "the client apparently is fond of him and would prefer that he suffer no consequences."

[¶54] The Administrator found, however, that, regardless of the relationship, Dell'Olio impermissibly placed his own interests ahead of his client:

> Additional disbursements were made from [his mother-in-law's] account in order to provide money to cover margin calls in Dell'Olio's personal account and to cover expenses for the firms. Dell'Olio's testimony is consistent in that he admits he and his firms were suffering financially. He also admits that some of the

money obtained from [her] non-purpose loan account was provided to Dell'Olio to cover margin calls on his personal account all the while placing [her] at holdings at risk for her own margin calls. . . .

. . . .

Clearly, Respondents were aware of the likelihood that [she] would not be repaid for the loan intended to be used to purchase the office building. Respondents' financial situation was such that any anticipated rent to be paid [to Dell'Olio's son] could *not* be paid, a fact that Respondents admit. Even after the continued and sharp decline in the market resulting in margin calls and increased risk of liquidation of [her] stock, Respondents continued to transfer funds from the non-purpose loan account based upon forged authorization letters . . . .

[¶55] In light of these findings and others related to the forgery of the mother-in-law's signature, all of which are amply supported in the record, the Administrator did not err in finding that, "[b]y borrowing money from [Dell'Olio's mother-in-law] as set forth [in the findings], the respondents committed unlawful, dishonest, or unethical practices." Nor did Dell'Olio's responses to these facts in the record promote a sense of strong ethical standards. As the Administrator noted, "Respondents go so far as to imply that dishonesty involving 'public customers' is an *aggravating* circumstance while dishonesty involving family members is a *mitigating* circumstance."

[¶56] The second course of conduct found by the Administrator—that Dell'Olio lied under oath and submitted false documents—is substantial justification for the harsh sanction. Dell'Olio's misrepresentation of facts and

fabrication or manufacturing of documentary exhibits[14] is at least as serious as the violation of North Atlantic's internal written supervisory procedures themselves because it demonstrates a lack of trustworthiness. The Administrator may impose a sanction for purposes of protecting clients if a broker-dealer, agent, investment adviser, or investment adviser representative has demonstrated untrustworthiness through dishonest practices. *See* 32 M.R.S. § 16412(4)(M). Dell'Olio's conduct, which was found to include willfully providing false documents to the Office of Securities and lying about the documents under oath before the Administrator, reasonably prompted the Administrator to exercise her discretion in a manner that is more protective of the public.

[¶57] Examining the factors that are relevant in this case—the misconduct occurred more than once; Dell'Olio, individually and as principal of the two entities under his control, was personally involved with the misconduct; and he both failed to concede the wrongfulness of much of the misconduct and lied in an effort to avoid taking responsibility for it—the facts raise a serious concern that Dell'Olio or his entities will commit violations in the future if they continue to

---

[14] Specifically, although Dell'Olio testified before the Administrator in this proceeding that he had borrowed $20,000 from his mother-in-law in 2006 as a loan, he earlier stated in a sworn deposition that his mother-in-law had tendered the full $20,000 to him in payment for renovations that he made to his wife's property and that he did not consider it to be a loan. He also submitted the subsequently edited version of North Atlantic's written supervisory procedures in an effort to pass it off as the version in effect when the transactions at issue took place rather than concede his mistake in accepting loans from his mother-in-law client.

hold licenses. *See Westmark Asset Mgmt. Corp.*, 37 P.3d at 519. In this context, despite the severity of the penalty imposed, we cannot conclude that the Administrator abused her broad discretion in revoking the licenses.

The entry is:

Judgment affirmed.

---

SAUFLEY, C.J., and MEAD, J., concurring in part and dissenting in part.

[¶58] Because Dell'Olio did not have an opportunity to be heard on the nature of the sanction at a meaningful time, that is, after the findings of violations were entered by the Administrator, we would remand for a hearing on sanctions.

[¶59] We concur in full with the Court's determinations that the process employed was not infected by bias, that the Administrator demonstrated commendable patience at the hearing, that the factual determinations in support of the conclusion that Dell'Olio and the companies violated critical rules are supported in the record, and that the investigation and proceedings were not time-barred. We further concur in the Court's delineation of the considerations that must be taken into account in determining the appropriate sanction in this type of licensing proceeding.

[¶60] Because we would conclude, however, that the process employed in the administrative proceeding should have included an opportunity for additional

briefing or argument on sanctions *after* the determination that violations had occurred, we would remand this matter for further consideration of the sanction to be imposed.

[¶61]  "If the administrator finds that the order is in the public interest and subsection 4 authorizes the action, an order issued under this chapter may revoke, suspend, condition or limit the license of a licensee."  32 M.R.S. § 16412(2) (2013). Before entering such a disciplinary order, the Administrator must provide "[a]ppropriate notice to the applicant or licensee," afford an "[o]pportunity for hearing," and reach "[f]indings of fact and conclusions of law in a record in accordance with Title 5, chapter 375 [the Maine Administrative Procedure Act]." 32 M.R.S. § 16412(7) (2013); *see also* 5 M.R.S. §§ 9051-9064 (2013) (governing administrative agencies' adjudicatory proceedings).

[¶62]  The process established through the typical procedural rulings did not afford an opportunity for the licensee to be heard *after* the findings were entered. We recognize that the relevant statutes do not require the Administrator to allow additional written or oral argument before determining a penalty.  We further note that Dell'Olio and his companies did not request such additional process or argue

on appeal that it is required.[15] Nonetheless, reviewing the imposition of the penalty for errors of law, *see Me. Real Estate Comm'n v. Jones*, 670 A.2d 1385, 1387 (Me. 1996), we would conclude that the process provided in these particular circumstances was lacking because it deprived Dell'Olio of the opportunity to be heard "at a meaningful time and in a meaningful manner," *Kirkpatrick v. City of Bangor*, 1999 ME 73, ¶ 15, 728 A.2d 1268 (quotation marks omitted).

[¶63] The Legislature itself has recognized that a full revocation of a professional license is a very serious sanction. Accordingly, in some administrative proceedings, when the ultimate sanction of a revocation has been imposed after an administrative hearing, the licensee has a right to a de novo hearing in a court. *See, e.g., Zablotny v. State Bd. of Nursing*, 2014 ME 46, ¶¶ 27-29, --- A.3d --- (construing 10 M.R.S. § 8003(5) (2013)). Here, there is no such additional process allowed by law. Therefore, unless the Administrator allows the licensee to be heard after entry of findings on the alleged violations, the licensee is left without a *timely,* meaningful opportunity to be heard on the sanctions. *See Kirkpatrick*, 1999 ME 73, ¶ 15, 728 A.2d 1268.

[¶64] The process employed here is akin to requiring a person who has been charged with multiple criminal offenses to make his sentencing arguments *before*

---

[15] Dell'Olio and the companies did argue in their reply brief on appeal that the notice of intent failed to allege what untruthful statements Dell'Olio made before the notice was issued.

the jury or fact-finder has determined what charges were proved. We would conclude that, when a person's very livelihood is at stake, the Administrator should, consistent with best practices, provide a meaningful opportunity to be heard on the proposed sanctions after entry of the findings of violations. Accordingly, before reviewing the sanction of revocation on appeal, we would remand this matter for additional written or oral argument and findings on the issue of sanctions.

---

**On the briefs and at oral argument:**

Neal L. Weinstein, Esq., Old Orchard Beach, for appellants North Atlantic Securities, LLC, Michael J. Dell'Olio & Associates, LLC, and Michael J. Dell'Olio

Paul Stern, Dep. Atty. Gen., Office of the Attorney General, Augusta, for appellee Office of Securities

Business and Consumer Docket docket number AP-12-01
FOR CLERK REFERENCE ONLY