2004 ME 31

**Laura ZEGEL**

v.

**BOARD OF SOCIAL WORKER LICENSURE.**

Supreme Judicial Court of Maine.

Argued: Dec. 9, 2003.
Decided: March 8, 2004.

Arthur J. Greif, Esq. (orally), Julie D. Farr, Esq., Gilbert & Greif, P.A., Bangor, for plaintiff.

G. Steven Rowe, Attorney General, Robert C. Perkins, Esq., Asst. Attorney General (orally), Augusta, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

SAUFLEY, C.J.

[¶ 1] Laura Zegel appeals from the judgment of the Superior Court (Penobscot County, *Mead, J.*) affirming the decision of the Board of Social Worker Licensure in which the Board concluded that Zegel had violated the National Association of Social Workers' Code of Ethics, censured her, placed her on probation, required that she consult with a social worker twice a month for six months, and assessed costs. Zegel argues that the Board violated her due process rights by permitting a Board member to testify as an expert, and that the Board abused its discretion in its imposition of costs and determination of sanctions. We affirm the finding of a violation, but vacate the imposition of costs and the choice of sanction, and remand the matter to the Board for further proceedings.

## I. BACKGROUND

[¶ 2] The record reflects the following facts in support of the Board's findings regarding the alleged violations. A woman seeking professional counseling telephoned Laura Zegel, a licensed clinical social worker, in September 2000. Zegel agreed to schedule an appointment and responded to the client's queries about payment by saying they would discuss it at the first session on September 20.

[¶ 3] At that session, the client again raised the subject of payment because her

insurance company would pay for the therapy. Zegel said they would discuss the issue at the end of the session after she had a better grasp of the client's treatment needs and privacy expectations. At the end of the session, Zegel said she could give the client a receipt for the insurance company, but warned that the receipt would contain some personal information, such as her diagnosis. The client said she might be able to pay on her own and scheduled another appointment.

[¶ 4] The client soon decided she needed her insurance to cover the cost of her therapy. She called Zegel, who told her they would talk about it at their next session on September 27. At that session, Zegel discouraged her from submitting her bill to her insurer because of the client's privacy issues. The client was not concerned about the information getting to her employer because her employer had expressly prompted her to seek therapy. She told Zegel she could not afford to continue therapy without using her insurance, paid Zegel $140 for the two sessions, and left without requesting a receipt because she did not believe Zegel would give her one.

[¶ 5] Two days later, the client wrote to Zegel. She thanked Zegel for her help and wrote:

Unfortunately, I won't be able to come back due to the insurance issue. Therefore, I would appreciate it if you would send me a receipt for the $140 I paid you for services rendered. I need this so I can apply the $140 towards my deductible for when I start seeing another therapist.

[¶ 6] Because she had not received a receipt from Zegel by the end of October, the client filed a complaint with the Maine Department of Professional and Financial Regulation's Office of Licensing and Registration. Zegel sent the client a receipt in early November before she received notice of the complaint.

[¶ 7] By letter from the Attorney General's office dated February 20, 2002, the Board offered Zegel a consent agreement by which Zegel would admit to violating 32 M.R.S.A. § 7059(1)(E) (1999)[1] and section 2(E) of chapter 5 of the Board Rules, 8 C.M.R. 02416005 § 2(E) (1997),[2] by violating provisions 1.01 and 1.02 of the National Association of Social Workers' Code of Ethics. The Code provides, in pertinent part:

1.01   Commitment to Clients

Social workers' primary responsibility is to promote the well-being of clients. In general, clients' interests are primary. . . .

1.02   Self–Determination

Social workers respect and promote the right of clients to self-determination and assist clients in their efforts to identify

---

1. The statute provides, in pertinent part:

   [T]he board may refuse to issue or renew . . . a license on any of the following grounds:

   . . . .

   E.   Any gross negligence, incompetency or misconduct in the practice of professional social work . . . .

   32   M.R.S.A. § 7059(1) (1999 & Supp.2003).

2. The rules provide that

   [t]he Board my take any disciplinary action authorized by statute based upon any of the grounds set forth in 32 MRSA Section 7059(1)(A) through (G).

   . . . .

   E.   *ANY GROSS NEGLIGENCE, INCOMPETENCY OR MISCONDUCT* in the practice of professional social work.

   8   C.M.R. 02 416 005 § 2 (1997). The rules define gross negligence, incompetency, or misconduct to include "engaging in conduct which violates the Code of Ethics adopted by the National Association of Social Workers in 1996." *Id.* § 3(C)(11).

and clarify their goals. Social workers may limit clients' right to self-determination when, in the social workers' professional judgment, clients' actions or potential actions pose a serious, foreseeable, and imminent risk to themselves or others.

As a censure, the consent agreement would have required Zegel to consult with another social worker one hour per month for six months regarding ethics provisions "in the current managed care environment." The social worker consultant would thereafter recommend to the Board whether Zegel should continue with consultation.

[¶ 8] Zegel declined to execute the consent agreement and requested a hearing before the Board of Social Worker Licensure. The Board held a hearing at which Zegel presented documentary evidence, as well as her own testimony and the testimony of Frederick Reamer, professor at the School of Social Work at Rhode Island College and chair of the task force that wrote the Code. Reamer testified about what types of conduct would constitute a violation of the Code. He testified that if a social worker spoke with a client to make sure the client understood the impact of using insurance to pay for counseling and the client still expressed the intent to pursue insurance coverage, "the social worker ought to comply with that request . . . in a timely manner." Reamer emphasized that he was not privy to the specifics of the client-social worker conversations in the case.

[¶ 9] In response, the Board presented Deborah Sheehan as an expert witness to testify about her opinion that if the client clearly expressed an intent to use her insurance and the social worker refused to cooperate, the social worker violated the Code. Sheehan is a licensed clinical social worker who participated in Zegel's case as

a Board member during the early stages when the Board investigated and referred the case for a hearing. Specifically, Sheehan moved to table the complaint against Zegel for further investigation in March 2001, and in April 2001, she seconded a motion to refer the case for an adjudicatory hearing. Sheehan took on a new role as a complaint officer for the Board in April of 2001 and did not sit as a decision-making Board member at the hearing.

[¶ 10] After the close of testimony, the Board found that Zegel had violated ethical standard 1.02, governing client self-determination. After some discussion about the form of censure, the chair of the Board moved for the discipline to include "the cost of the hearing." Those costs included the hourly expenses incurred by the Board in retaining a hearing officer who assisted the Board during the hearing, but did not act as an adjudicator.

[¶ 11] The Board issued its written decision in May 2002. It found that Zegel violated Standard 1.02 of the Code of Ethics when she

discouraged [the client] from her goal of applying for insurance reimbursement without fully assisting her in her effort and assessing whether her client understood the insurance related issues. For example, she did not explore with [the client] the latter's feelings if the counseling records were shared with others or what information [the client's] insurance company required in order for payment to be made. This resulted in the termination of a beneficial therapeutic relationship.

The Board censured Zegel and placed her on probation, ordering her to consult with another social worker *twice* per month for six months at her own expense on the subject of "billing/payment practices including issues related to self-determination." The Board required that

the consultant report quarterly on Zegel's progress and recommend whether Zegel presents an ongoing risk of committing a similar violation. After the final report, the Board would reconvene to determine whether the terms of probation had been met. The Board also directed Zegel to pay $1150 for the cost of the hearing officer by July 31, 2002.

[¶ 12] Zegel appealed to the Superior Court pursuant to 5 M.R.S.A. § 11002 (2002) and M.R. Civ. P. 80C. In addition, Zegel petitioned the Board for a stay pending appeal, attaching to her request an affidavit explaining her inability to pay for the counseling and costs. The Board denied her request, after which Zegel moved in the Superior Court to stay the imposition of the sanctions and costs pending appeal. The court granted her motion.

[¶ 13] After briefing and oral argument, the Superior Court affirmed the Board's decision. Zegel filed a timely notice of appeal to the Law Court. M.R. Civ. P. 80C; M.R.App. P. 2.

## II. DISCUSSION

### A. Standard of Review

[¶ 14] Zegel does not challenge the Board's factual finding that she violated the Code. We therefore review the Board's decision only to determine whether it applied the law correctly and whether it exceeded the bounds of its discretion. *Connolly v. Bd. of Soc. Work Licensure,* 2002 ME 37, ¶ 6, 791 A.2d 125, 127. As the party seeking to vacate the agency's decision, Zegel bears the burden of persuasion on appeal. *Town of Jay v. An-*

*droscoggin Energy, LLC,* 2003 ME 64, ¶ 10, 822 A.2d 1114, 1117.

### B. Sheehan's testimony

[¶ 15] Zegel contends that the Board violated her basic due process rights when it permitted Sheehan to testify as an expert after she had played an active role in pursuing Zegel's case in its earlier stages as a Board member. The Board contends that it did not violate Zegel's due process rights because Sheehan did not participate in the hearing as an adjudicator and Zegel did not establish bias during the hearing.

[¶ 16] An administrative process may be infirm if it creates an intolerable risk of bias or unfair advantage. *Gashgai v. Bd. of Registration in Med.,* 390 A.2d 1080, 1082 n. 1 (Me.1978) (stating in dictum that "the combination of investigator, prosecutor and *sitting member of the adjudicatory panel,* even if ostensibly a nonparticipating member, creates an intolerably high risk of unfairness") (emphasis added); *see also Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); *Brengelmann v. Land Res. of New Eng. & Can., Inc.,* 393 A.2d 174, 178 (Me. 1978).[3]

[¶ 17] We need not determine whether the process used here crossed the line because the error, if any, was harmless. *See So. Me. Props. Co., Inc. v. Johnson,* 1999 ME 37, ¶ 9, 724 A.2d 1255, 1257 (stating that procedural errors are harmless unless they are inconsistent with substantial justice and result in prejudice). Zegel was not prejudiced by Sheehan's testimony, which agreed with that of her own expert—that is, if Zegel failed to co-

---

3. A combination of investigative and adjudicatory functions in administrative proceedings generally does not violate due process absent some further showing of bias or the risk of bias. *Withrow v. Larkin,* 421 U.S. 35, 52–55, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); *see also Fed. Trade Comm'n v. Cement Inst.,* 333 U.S. 683, 702–03, 68 S.Ct. 793, 92 L.Ed. 1010 (1948) (stating it is not per se impermissible for an agency to adjudicate a case after having expressed an opinion about whether certain conduct is permitted by law).

operate with her client's expressed intent, she violated the code. The Board's factual finding that Zegel discouraged her client from "her goal of applying for insurance reimbursement without fully assisting her in her effort," led to the conclusion that Zegel violated the Code. This conclusion comports with each expert's construction of the Code.

## C. Costs

[¶ 18] Zegel next contends that the Board abused its discretion in imposing, in addition to other sanctions, $1150 in costs without first hearing evidence and argument about her ability to pay.

[¶ 19] Upon finding a violation, the Board is permitted by statute to "assess the licensed person ... for all or part of the actual expenses incurred by the board," including the "hourly costs of hearing officers." 10 M.R.S.A. § 8003–D (Supp.2003). Although the statute does not expressly mandate a hearing about the licensed person's ability to pay, the Board is required to exercise its discretion reasonably in imposing costs. *Cf. Hannum v. Bd. of Envtl. Prot.*, 2003 ME 123, ¶¶ 14–17, 832 A.2d 765, 769–770 (holding that the findings upon which the Board exercised its discretion must be supported by evidence in the record). In the present case, the Board imposed conditions on Zegel as both sanction and rehabilitation. The expense involved in complying with those conditions was significant. The Board then went on to add the additional sanction of requiring payment of the State's costs, but did so without determining whether she had any capacity to pay the additional costs. We conclude, on these facts, that the Board exceeded the bounds of its discretion when it imposed the additional costs without making any inquiry into Zegel's ability to pay and declined to address

her ability to pay when she raised it in a postjudgment motion. *See Maddocks v. Unemployment Ins. Comm'n*, 2001 ME 60, ¶ 8, 768 A.2d 1023, 1025–26. Without this information, the Board could not exercise reasonable discretion in deciding whether Zegel should bear the burden of paying the State's costs, in addition to the ordinary sanctions. We must, therefore, remand the matter to the Board with instructions to consider evidence of Zegel's ability to pay.

## D. Sanctions

[¶ 20] Zegel also contends that the Board was required to articulate why it chose to impose a censure instead of a warning. She further argues that the Board acted in an arbitrary and capricious manner when it imposed bi-monthly counseling as a condition of probation, having previously suggested once-monthly counseling as part of its proposed consent agreement. She contends that there is nothing in the record to demonstrate a lack of remorse or any other reason to impose a harsher sanction on a more favorable record, especially when the Board found fewer violations than anticipated by the consent agreement. The Board counters that it was not required to explain why it chose censure and bi-monthly counseling over any other sanctions because it appropriately exercised its discretion in imposing the sanctions.

[¶ 21] The Board rule governing the imposition of sanctions provides, in relevant part, that "[t]he Board may take any disciplinary action authorized by statute based upon any of the grounds set forth in 32 MRSA Section 7059(1)(A) through (G)." 8 C.M.R. 02416005 § 2 (1997). Section 7059 of title 32 provides only that the Board may "suspend or revoke" a license pursu-

ant to 5 M.R.S.A. § 10004 (2002),[4] or that it may "refuse to issue or renew" a license if, among other reasons, a social worker commits "[a]ny gross negligence, incompetency or misconduct in the practice of professional social work." 32 M.R.S.A. § 7059(1)(E) (1999 & Supp.2003).

[¶ 22] Despite the limited authority granted by title 32, however, the statutes governing the Department of Professional and Financial Regulation empower the Board to issue warnings, impose censures or reprimands, impose civil penalties of up to $1500 per violation, and impose conditions of probation, among other things. 10 M.R.S.A. §§ 8001(38)(EE) & 8003(5)(A–1) (1997 & Supp.2003). These powers are granted "[i]n addition to authority otherwise conferred, unless expressly precluded by language of denial in [the Board's] own governing law." 10 M.R.S.A. § 8003(5) (Supp.2003). Thus the Board acted within its authority in fashioning a sanction that included a censure and in imposing conditions of probation.

[¶ 23] We also reject Zegel's argument that the proposed consent agreement provides the parameters, or even a context for determining sanctions after the hearing. *Cf. State v. Little,* 527 A.2d 754, 755–56 (Me.1987) (stating that, to promote open dialogue in plea negotiations, communications made during such negotiations are inadmissible in court pursuant to Rule 410 of the Maine Rules of Evidence).

[¶ 24] The Board's decision, however, fails to explain why it decided to impose the sanctions it chose. Both statute and case law require the Board to set out findings that justify its decision; we may not hypothesize about the Board's reasoning. 5 M.R.S.A. § 9061 (2002) (providing

that an agency's decision "shall include findings of fact sufficient to apprise the parties and any interested member of the public of the basis for the decision"); *Gashgai,* 390 A.2d at 1085 ("Courts need to know what an agency has really determined in order to know even what to review."). Because we may only determine whether the Board acted within the bounds of its discretion if we understand the specific facts that justify the sanctions imposed, we must require the agency to articulate its reasons for imposing the sanctions.

The entry is:

The Board's imposition of $1150 in costs and the Board's choice of censure with conditions of probation as a sanction are vacated and remanded for proceedings consistent with this opinion. In all other aspects, we affirm the decision of the Board.

---

4. Section 10004 of title 5 permits an agency to "revoke, suspend or refuse to renew [a] license" without an administrative hearing in specific circumstances. 5 M.R.S.A. § 10004 (2002).