STATE OF MAINE
KENNEBEC, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-20-17

DR. JAN B. KIPPAX, D.M.D.,
Petitioner,

**DECISION AND ORDER**

STATE OF MAINE BOARD OF
DENTAL PRACTICE,
Respondent

## INTRODUCTION

Dr. Jan B. Kippax, D.D.S. has appealed a Decision and Order of the Maine Board of Dental Practice (the Board) dated March 13, 2020 that imposed disciplinary sanctions upon him following an evidentiary hearing held on October 11, 2019, and re-opened deliberations on sanctions only conducted on March 13, 2020. This appeal has been brought pursuant to 5 M.R.S. §§ 11001-11002 (Maine Administrative Procedure Act), 10 M.R.S. § 8003(5)(G) and M.R.Civ.P. 80C.

Dr. Kippax contends that the Board's Decision must be vacated because: (1) The Board failed to find violations against Dr. Kippax based on expert testimony; (2) The Board was biased against him; (3) The Board erroneously used the preponderance of the evidence standard of proof, rather than clear and convincing evidence, in finding that he violated the Dental Practice Act, and; (4) The Board committed error when it reopened the hearing on the question of sanctions.

## FACTUAL AND PROCEDURAL BACKGROUND

This case involves the imposition of discipline against Dr. Kippax as a result of his surgical treatment of "Patient A," who was diagnosed with having a benign mucocele on her right lower lip. Based on the evidence presented to the Board, including the testimony of Dr. Kippax himself, mucocles are "'salivary retention phenomena' in which the outflow duct of the salivary gland is damaged or pinched

and then expands like a water balloon as saliva is produced." They are generally considered to be benign. *(Administrative Record, "AR" at 5, n.7).* Patient A is a board-certified audiologist who was hit in the face with a child's stuffed toy and developed a small bump on the right side of her lower lip. She was referred to Dr. Kippax, who saw her on July 1, 2016. According to Patient A's complaint to the Board dated March 2, 2017, Dr. Kippax told her that the bump was a mucocole and that it would be very simple to remove with a small incision requiring just a few sutures – no more than 4. *(AR at 22).* Patient A complained that Dr. Kippax never said anything to her about removing any margin of tissue surrounding the mucocele, nor did he warn her that the procedure he was about to perform could cause disfigurement of her lip and might require reconstructive plastic surgery. *(AR at 5).*

After Patient A's bottom lip was anesthetized, she became concerned because the procedure was taking much longer than she had expected based on what Dr. Kippax had told her. She could smell burning skin as the procedure was in progress and stopped counting the number of stiches when she got to sixteen (16). When the procedure was completed, Dr. Kippax remarked that the mucocele was larger than anticipated and there might be "slight disfiguring," and he commented that "plastics can do magic now." *(AR at 6).* When she was handed a mirror, "Patient A 'saw that a quarter to a third of my lip was missing,' the pink part of the lip in the area was 'almost all gone,' and her teeth were visible with the lips closed." *(Id).* She began to sob and cried for 15-20 minutes, before being escorted out the rear door. She called her husband from the car.

Later that day, she and her husband went to the local emergency room, where she was asked if she had been attacked by a dog. She was referred to a plastic surgeon who advised her to wait for the wound to heal and later to do scar massages on a daily basis for six months. Patient A filed her complaint with the Board in

March 2017 after learning of other complaints having been filed with the Board against Dr. Kippax. *(Id)*.

Plastic surgery was planned and performed in December 2017 to restore "normal lip contour," because the removal of the mucocele by Dr. Kippax had left Patient A "with a large divot of the right lower lip that prevented oral competence in that area." The plastic surgery involved a V-wedge incision to perform a "7cm complex repair . . . including muscle, mucosa, deep dermis and skin." *(Id)*.

Dr. Kippax filed his response to Patient A's complaint on or about May 8, 2018. Further correspondence between the Board Staff and Dr. Kippax extended into March 2019. *(AR at 26, 65, 67)*. It appears that the delay was due, at least in part, to the need to obtain all relevant medical and dental records. Ultimately, the Board issue a "Second Revised Notice of Hearing" dated September 25, 2019 setting the date for the adjudicatory hearing for October 11, 2019. The notice of hearing announced that the purpose of the hearing was to determine "whether by a preponderance of the evidence grounds exist to take adverse action against the license of Dr. Kippax as follows:

1. Pursuant to 32 M.R.S. § 18325(1)(E) and Board Rules chapter 9, § II(R) for engaging in unprofessional conduct by violating a standard of care that has been established in the practice of dentistry;

2. Pursuant to 32 M.R.S. § 18325(1)(D)(1) for professional incompetence as defined by statute as engaging in conduct that evidences a lack of ability or fitness to perform the duties owed by a dentist to a patient;

3. Pursuant to 32 M.R.S. § 18325(1)(D)(2) for incompetence as defined by statute as engaging in conduct that evidences a lack of knowledge or inability to apply principles or skills to carry out the practice of dentistry;

4. Pursuant to 32 M.R.S. § 18325(1)(E) and Board Rules chapter 9 § II(P) for failing to retain/maintain complete patient records for a period of no less than seven (7) years after cessation of a patient's treatment.

*(AR at 14).*

Well in advance of the hearing, the Board Staff, represented by the Attorney General's Office, designated Dr. Killian MacCarthy, D.M.D., M.D., as its expert witness. Dr. MacCarthy is in the same practice as Dr. Mark D. Zajkowski, D.D.S., M.D., a member of the Board, who was recused from sitting on this case because he served as the complaint officer during the investigation of Patient A's complaint. Prior to the hearing, Dr. Kippax moved to dismiss the complaint against him on the basis that there was an intolerably high risk of bias towards him because, he alleged: (1) the Assistant Attorney General who would be prosecuting the case against him before the Board also acted as counsel to the Board during the investigatory stage of the case, and; (2) Dr. MacCarthy, as a result of his relationship with Dr. Zajkowski, had become , in essence, a "de facto" member of the Board. *(AR at 559).* Dr. Kippax also moved to have the Board utilize a "clear and convincing evidence" standard of proof rather than the preponderance of the evidence standard. *(AR at 579).*

Because the motion to dismiss was a dispositive motion, the Hearing Officer for the Board – Attorney Mark F. Terison, Esq. – referred that motion to the Board for resolution at the start of the hearing on October 11, 2019. After discussion, the Board voted unanimously to deny the motion. *(AR at 319 – Transcript, hereinafter "T" at 9).* The Hearing Officer also denied the request to employ the clear and convincing standard of proof. *(AR at 319 – T at 11).* Next, the Board members were asked whether any of them had a personal or professional relationship with any of the potential witnesses that would affect their ability to be fair and impartial. Two members of the Board, Dr. Morse, the Chair, and Dr. Ray, disclosed that they refer

patients to Dr. MacCarthy's practice. Both Board members represented that they could continue to be fair and impartial, notwithstanding that referral relationship. The two Board members were also questioned by counsel and confirmed that there was no formal referral agreement with Dr. MacCarthy's practice, it was not an exclusive referral arrangement, and there was no compensation involved with any referral. *(AR at 322).* Both Board members reiterated that they could be fair and impartial in their consideration of the case involving Dr. Kippax. *(AR. at 324).*

Following opening statements, the testimonial portion of the hearing began. In its case-in-chief, the Board Staff called Dr. Kippax, Patient A., and Dr. MacCarthy. In the licensee's presentation of evidence, Dr. Kippax was recalled. Dr. Stuart Lieblich, D.M.D. testified as the licensee's designated expert witness. At the conclusion of the presentation of evidence, Dr. Kippax renewed his motion to dismiss, which was denied by the Board. *(AR. at 432).* Following closing arguments, the Board began its public deliberations, and addressed each of the four alleged violations as identified in the Second Revised Notice of Hearing.

As to alleged violation # 1, that Dr. Kippax violated a standard of care, the Board voted 4 to 1 that he had engaged in unprofessional conduct by violating a standard of care in the practice of dentistry. *(AR. at 443).*

As to alleged violation # 2, that Dr. Kippax engaged in conduct that showed a lack of ability or fitness to perform the duties owed by a dentist to a patient, the Board voted 5 to 0 that the violation had been proven. *(AR. at 444).*

As to alleged violation # 3, that Dr. Kippax engaged in conduct showing a lack of knowledge or an inability to apply principles or skills to carry out the practice of dentistry, the Board voted 5 to 0 that the violation had been proven. *(AR. at 446).*

Finally, as to alleged violation # 4, that Dr. Kippax failed to retain and/or maintain complete patient records for the required period of time, the Board voted 5 to 0 that the violation had not been proven. *(AR. at 446).*

The Board then proceeded to the question of sanctions. At that point, Dr. Kippax again took the stand and testified that he had outstanding liabilities of approximately $95,000 in unpaid legal fees, $60,000 in spousal support arrearages, $60,000 in unpaid taxes. He further testified that his patient volume had been reduced to about 25% of what it had been previously, and his malpractice insurance had essentially doubled. His retirement savings of approximately $450,000 had been withdrawn and exhausted, resulting in the tax liability noted above. *(AR. at 448-49)*. In short, Dr. Kippax testified that he was unable to pay any financial sanction the Board might be inclined to impose.

At the conclusion of its deliberations, the Board voted 4-0-1 to impose the following sanctions upon Dr. Kippax: A reprimand with the licensee being placed on probation for 5 years subject to the condition that he complete continuing education pre-approved by the Board consisting of 3 course hours in patient communication and 6 course hours in oral pathology, to be completed within 12 months of the Board's Decision and Order and to be in addition to the regularly required continuing education credits needed for license renewal. *(AR. at 458)*.

The adjudicatory hearing was completed at 10:29 p.m., having lasted approximately 14 hours. *(AR at 458; AR at 4)*. The Hearing Officer proposed that he would draft the written Decision and Order for consideration at the Board's meeting scheduled for November 8, 2019. *(AR at 458)*. Two days prior to that hearing, however, the Hearing Officer received a telephone call from the Board Chair inquiring as to whether the Board could re-open its deliberations on the issue of sanctions. *(AR at 964)*. The Hearing Officer received another call from the Board on the morning of the November 8, 2019 meeting, also asking whether the deliberations on sanctions could be re-opened. *(AR at 962)*. The Hearing Officer advised the Board that its Decision and Order was not final until it was adopted and signed and that, therefore, the Board had the legal authority to re-open its

deliberations. *(AR at 964).* The Board did, in fact, vote to re-open deliberations on the question of sanctions, and those re-opened deliberations were ultimately scheduled for March 13, 2020. *(AR at 962).*

In the meantime, Dr. Kippax filed a Motion for Reconsideration asking that the Board dismiss Patient A's complaint on the basis that: (1) the Board failed to find violations based on expert testimony; (2) the Board impermissibly considered past alleged violations to determine liability, and; (3) the Board was impermissibly biased. *(AR at 970).* Later, Dr. Kippax re-filed this motion as both a motion for reconsideration and a motion to dismiss. *(AR at 985).* Those motions were denied after the Board completed its re-opened deliberations on sanctions on March 13, 2020. *(AR at 520).*

The Board began its re-opened deliberations on sanctions with four of the five Board members who had sat at the adjudicatory hearing on October 11, 2019. *(AR at 515-16).* Based on past practice, the Board decided to add, as a sanction, a requirement that Dr. Kippax pay up to $6,000 for the cost of the investigation/hearing, to be paid within 12 months of the Decision and Order. *(AR at 517).* The Board also voted to require Dr. Kippax to undergo a behavioral assessment by the Maine Medical Professionals Health Program (MMPHP) within 90 days of the Decision and Order. *(AR at 519-20).* The Board's written Decision and Order was modified to reflect the additional sanctions and was apparently adopted by the Board and signed on March 13, 2020. *(AR at 10).*

On or about April 13, 2020, Dr. Kippax moved to stay the Board's Decision and Order pending this petition for judicial review. *(AR at 1006).* That motion was denied by the Board at its April 17, 2020 meeting. *(AR at 1014).* This Petition for Judicial Review was filed on April 8, 2020. Briefing was completed on September 17, 2020 and argument was held on March 11, 2021.

## STANDARD OF REVIEW

The Law Court has frequently reaffirmed the principle that judicial review of administrative agency decisions is "deferential and limited." *Passadumkeag Mountain Friends v. Bd. of Envtl. Prot.*, 2014 ME 116, ¶ 12, 102 A.3d 1181 (quoting *Friends of Lincoln Lakes v. Bd. of Envtl. Prot.*, 2010 ME 18, ¶ 12, 989 A.2d 1128). The court is not permitted to overturn an agency's decision "unless it: violates the Constitution or statutes; exceeds the agency's authority; is procedurally unlawful; is arbitrary or capricious; constitutes an abuse of discretion; is affected by bias or error of law; or is unsupported by the evidence in the record." *Kroger v Departmental of Environmental Protection*, 2005 ME. 50, ¶ 7, 870 A.2d 566. The party seeking to vacate a state agency decision has the burden of persuasion on appeal. *Anderson v Maine Public Employees Retirement System*, 2009 ME. 134, ¶ 3, 985 A.2d 501. In particular, a party seeking to overturn an agency's decision bears the burden of showing that "no competent evidence" supports it. *Stein v. Me. Crim. Justice Academy*, 2014 ME 82, ¶ 11, 95 A.3d 612.

This court must examine "the entire record to determine whether, on the basis of all the testimony and exhibits before it, the agency could fairly and reasonably find the facts as it did." *Friends of Lincoln Lake v Board of Environmental Protection*, 2001 ME. 18 ¶13, 989 A. 2d 1128. The court may not substitute its judgment for that of the agency on questions of fact. 5 M.R.S. § 11007(3). Determinations of the believability or credibility of the witnesses and evidence, supported by substantial evidence in the record, should not be disturbed by the court. *Cotton v Maine Employment Security Commission*, 431 A. 2d 637, 640 (Me. 1981). The issue is not whether the court would have reached the same result the agency did, but whether the "record contains competent and substantial evidence that supports the result reached" by the agency. *Seider v. Board of Examiners of*

*Psychologists,* 2000 ME 206, ¶ 8, 762 A.2d 551 *quoting CWCO, Inc. v. Superintendent of Insurance,* 1997 ME 226, ¶ 6, 703 A. 2d 1258, 1261.

## DISCUSSION

In his petition for judicial review, Dr. Kippax seeks to have the court vacate the Board's disciplinary Decision and Order on a number of grounds. Specifically, Dr. Kippax claims that reversal of the Board's action is necessary because: (1) The Board failed to find violations of the Dental Practice Act based on expert testimony; (2) The Board was – based on several factors – impermissibly biased against him; (3) The Board utilized the wrong standard in evaluating whether Dr. Kippax had violated the Dental Practice Act, and; (4) The Board erred in re-evaluating its discipline, which also demonstrates its impermissible bias.

The court will address each of these arguments in the order presented by Dr. Kippax in his brief.

### 1. Did the Board fail to find violations on the basis of expert testimony?

Pointing to remarks made by two Board members (Morse and Wellington) during deliberations, Dr. Kippax contends that the Board did not have expert testimony that he violated a standard of care in the practice of dentistry to support the alleged violations (1, 2 & 3) he was found to have committed. Specifically, both Board members, Morse and Wellington, stated during deliberations that they understood Dr. MacCarthy to initially testify that Dr. Kippax's surgical treatment of Patient A's mucocele had deviated from the standard of care expected of a reasonably skilled oral surgeon, but that he later reversed himself. *(See, e.g., AR at 439 – T at 492; AR at 440 – T at 496-97; AR at 442 – T at 504).* From these comments, Dr. Kippax argues that the Board did not have expert evidence from which to conclude that the standard of care was violated by him.

The court has examined Dr. MacCarthy's testimony in its entirety, multiple times, and has searched in vain for any indication that he changed his opinion that

the standard of care was breached by Dr. Kippax by virtue of his overly aggressive surgical approach to the removal of Patient A's mucocele. Dr. MacCarthy clearly testified that there was no good reason for Dr. Kippax to remove a margin of surrounding tissue when removing Patient A's mucocele. *(AR at 381 – T at 259)*. He further testified that it was highly unusual for there to be a facial deformity as a result of the removal of a benign mucocele and he had never seen such a result. *(AR at 385 – T at 276)*. Although Dr. Kippax has maintained that the mucocele procedure was complex, Dr. MacCarthy disagreed and testified that a general dentist, with no special skills as an oral surgeon, was capable of performing the removal procedure *(AR at 388 – T at 285)*. Regarding the decision by Dr. Kippax to remove the mucocele with a surrounding margin of tissue, Dr. MacCarthy testified:

A. My concern with him removing it in one chunk is that it has left a volume defect that is going to be very challenging to manage. The tissue management then made it difficult to maintain the volume for aesthetics and function to the lower lip.

Q. When you say difficult to manage, what does that mean in - -

A. The patient, the lip does not look the same since she had this biopsy performed. The end goal is after procedure, someone, for a benign lesion, should look the same afterwards such as a mucocele.

Q. And how important is it to remove the entire mucocele when you're concerned about cosmetics?

A. The only risk, if you don't get the whole mucocele out, is that it could reoccur. There are many people who will bite them on their own or stick needles in them and they don't come back. But as a surgeon who is intervening to help manage this, I think the discussion would be the worse [sic] case is if I don't take all the tissue out, it might come back. But now we're going to establish a relationship and come back when it's small and if we want to then perform an excisional biopsy with minimal volume loss, then we can go ahead and do that. *(AR at 388 – T at 285-86)*.

On the specific question as to whether he had an opinion that Dr. Kippax breached the standard of care expected of a reasonable and prudent oral surgeon, Dr. MacCarthy had this to say:

Q. Okay, Dr. MacCarthy, in your professional opinion, was it necessary to remove the amount of tissue that Dr. Kippax did in order to remove the mucocele from [Patient A's] lip?

A. No.

Q. Why do you say that?

A. The amount of tissue that he removed left the patient disfigured with a volume defect that required a V wedge excision of the lower lip which is usually reserved for patients with squamous cell carcinoma of the lower lip.

Q. And that wasn't possibly the case?

A. Correct.

Q. What relationship did the removal of this extra tissue play to the creation of the defect that [Patient A] suffered to her lip?

A. The tissue that was removed made it challenging for Dr. Kippax to be able to bring the edges together without distorting the normal architecture of the lip.

Q. In your opinion, would an ordinary and prudent oral surgeon in Maine be able to remove this mucocele without taking the amount of tissue that Dr. Kippax removed?

A. Yes.

Q. Why do you say that?

A. Because I, myself, have removed many mucoceles, and I have not had a volume defect that left a cosmetic defect that required a secondary procedure.

Q. Under the circumstances of this case, did Dr. Kippax have a professional obligation to advise [Patient A] that she might experience scarring?

A. He should have advised the patient that his planned excision with normal margins was going to leave a volume defect that could cause a scarring of the lower lip.

Q. Do you have an opinion about whether Dr. Kippax breached the standard of care when he removed the mucocele from [Patient A]?

A. My opinion is that someone who is having a mucocele removed, which is a benign lesion, should not end up needing plastic and reconstructive surgery afterwards.

Q. And is your opinion that when he removed the mucocele, that he violated the standard of care of an ordinary and prudent oral surgeon in Maine?

A. Yes.

Q. And why do you say that?

A. Because the mucocele is a benign lesion, and I think with an open discussion with the patient, unless she was in a hurry and was catching a plane to Africa and needed it done and definitively treated that day, I think with an understanding that an unroofing procedure or just excising the mucocele and the offending glands and closure could possibly lead to recurrence. I think from her testimony, she would have accepted that in the discussion versus a full excision with normal tissue around it and a volume defect of the lip.

*(AR at 392 – T at 301-04).*

On cross-examination, Dr. MacCarthy reaffirmed that the standard of care for the removal of a benign mucocele was that "someone should not be deformed." *(AR*

*at 393 – T at 307).* When asked by a Board member (Chair Morse) whether he felt that Dr. Kippax's aggressive approach to the removal of Patient A's mucocele showed a lack of ability or incompetence, Dr. MacCarthy replied:

> "I think he doesn't understand the volume defect that he created or before the procedure knowing that he would end up with something that would be challenging to manage." *(AR at 406 – T at 360).*

It is true that there were individual aspects of Dr. Kippax's approach that Dr. MacCarthy did not take issue with as far as the standard of care was concerned. For example, Dr. MacCarthy did not see a deviation from the standard of care in the choice to use an electrocautery device rather than a scalpel *(AR at 397 – T at 323)*, or to make a vertical incision versus a horizontal one *(AR at 397 – T at 321)*, or to send the sample to pathology for evaluation *(AR at 397 – T at 323)*, or in his diagnosis of a mucocele and his decision to remove it. *(AR at 393 -T at 306)*. Rather, it was the surgical approach used by Dr. Kippax in removing the mucocele that Dr. MacCarthy believed constituted a beach of the standard of care. It was not simply that Dr. Kippax ended up with an unfortunate result, it was that he did not understand or appreciate, and did not convey to Patient A, that his aggressive approach would result in a significant facial deformity for his patient. Indeed, as the Board found, Dr. Kippax testified that he had no memory of the volume defect he caused in Patient A's lower lip, had no memory of how upset she became after the procedure, believed the surgery had been "done well," and he would do it the same way if he had the chance. *(AR at 7)*.

Notwithstanding the comments by two Board members during deliberations, in its written Decision and Order adopted on March 13, 2020, the Board specifically found that "Dr. MacCarthy testified that the Licensee violated the standard of care required of the ordinary and prudent oral surgeon in Maine." *(AR at 8)*.

Based on its review of the entire record, the court is satisfied that the Board's findings are supported by substantial evidence, including expert evidence on the standard of care, such that the Board "could fairly and reasonably find the facts as it did." *Doane v. Dep't of Health and Human Services*, 2021 ME 28, ¶ 38, ___A.3d ___.

## 2. Was the Board impermissibly biased against Dr. Kippax?

Dr. Kippax has alleged that, for a number of reasons, the Board was impermissibly biased against him. His reasons can be grouped into three grounds. First, he argues that the Assistant Attorneys General who prosecuted this case on behalf of the Board Staff, had earlier acted as counsel to the Board during the investigation of Patient A's complaint. Second, he alleges that Dr. MacCarthy's relationship to recused Board member Dr. Zajkowski, as well as the referral relationship two Board members had with Dr. MacCarthy's and Dr. Zajkowski's practice, created an intolerable risk of prejudice. Third, Dr. Kippax asserts that prior Board actions involving him tainted this proceeding and rendered it unfair.

The court will consider each of these arguments in turn.

### A. *Commingling of roles of Assistant Attorneys General*

This court has previously addressed a claim that there was a due process violation where an assistant attorney general served multiple functions for the Board of Dental Practice and its staff at various stages in a disciplinary matter. *See Narowetz v. Maine Board of Dental Practice*, KEN-AP-19-43 (Stokes, J.) (November 12, 2020).

In this case, the court has examined the administrative record and finds no basis to conclude that the conduct of the AAGs involved in this matter were improper or contributed in any way to a due process violation. The court believes that the cases relied upon by Dr. Kippax are easily distinguishable.

*Berry v. Maine Public Utilities Comm.*, 394 A.2d 790, 793 (Me. 1978), involved an adjudicatory hearing in which Berry was denied the opportunity to present and develop his case when the commission declared that it had "heard enough." In addition, the Law Court noted that there was "some evidence" of *ex parte* communications between a commission member and a staff attorney "inconsistent with their respective roles as judge and advocate." No such circumstances are present in this record.

In *Schaffer v. State Board of Veterinary Medicine*, 143 Ga. App. 68, 237 S.E.2d 510 (1977),[1] the attorney acting as the prosecutor was also providing legal advice to the board in such a way that the court was compelled to conclude that a fair hearing could not be conducted. In particular, the court described the prosecutor/legal advisor as being "uncompromising" in construing legal points "strongly" against the appellant, and he did so with a "sometime venomous attitude." 143 Ga. App. at 71. No such behavior occurred in this case. On the contrary, the Board took the appropriate step of contracting with an experienced attorney to serve as the presiding officer for the adjudicatory hearing on October 11, 2019 and for its re-opened deliberations on March 13, 2020. *See* 5 M.R.S. § 9062

*Lyness v. Commonwealth*, 529 Pa. 535, 605 A.2d 1204 (1992) was a divided decision of the Pennsylvania Supreme Court that appears to have adopted a *per se* rule that a due process violation occurs under the state constitution if an administrative body is involved in the investigatory stage of a matter and later sits as an adjudicatory body on the same matter. The majority in *Lyness* recognized that its interpretation of the state due process clause differed from the due process requirements embodied in the federal constitution. 605 A.2d at 1210, n. 15 (referring to *Withrow v. Larkin, 412 U.S. 35 (1971)* as embracing a different view of due

---

[1] *Overruled on other grounds in In Re Kennedy*, 266 Ga. 249, 251, n. 1, 466 S.E. 2d 1 (1996).

process under the U.S. Constitution). *See also In Re Marcone*, 359 Fed. Appx. 807, 809 (3rd Cir, 2010) ("*Lyness* is not helpful as it addresses due process under the Pennsylvania Constitution"); *Day v. Borough of Carlisle,* 2006 U.S. Dist. LEXIS 46434, *32 (M.D. Pa.) (same). This court's own research suggests that no court, other than the Pennsylvania state courts, have adopted the due process standard announced in *Lyness*. The parties have not directed the court's attention to any case that has followed the *Lyness* approach.

As a general proposition, "the combination of investigative and adjudicatory functions does not, without more, constitute a due process violation." *Withrow v. Larkin*, 421 U.S. at 58. Both the United States Supreme Court and the Maine Law Court have recognized that '[i]t is also very typical for the members of administrative agencies to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. This mode of procedure does not violate the Administrative Procedure Act, and it does not violate due process of law." 412 U.S. at 56. *N. Atl. Sec., LLC v. Office of Sec.,* 2014 ME 67, ¶ 42, 92 A.3d 335 (no due process violation where Securities Administrator issued Notice of Intent to Revoke/Suspend and also adjudicated case).

Notwithstanding this general rule, however, there may be "special facts and circumstances" in a case that create an "intolerably high" risk of unfairness. Accordingly, it is necessary to look at the specific facts of a case in order to determine whether the likelihood of bias or unfairness is unacceptably high.

Looking at the facts of this case, the court is satisfied that Dr. Kippax has failed to show any impropriety on the part of the AAGs. The allegation that the AAGs, who advised the Board and the staff during the investigative stage of the proceedings involving Dr. Kippax violated his due process rights by later prosecuting the charge against him at the adjudicatory hearing, is without merit. "It is neither unlawful nor uncommon for the attorney general to both give advice to

various administrative agencies, and thereafter prosecute actions brought by the agency." *Collison v. Iowa Bd. of Med.*, 2014 Iowa App. LEXIS 64, * 19, 843 N.W.2d 476.

As an initial matter, it must be observed that the AAGs assigned to this matter had no authority or discretion over the Board's decision-making process. *Id.* In other words, at no point did any member of the Attorney General's Office act as an adjudicator. Stated simply: the AAGs did what they were assigned to do, namely, provide legal advice to the Board and the Board's staff during the investigatory stage, and then prosecuted the disciplinary action before the Board, as authorized by the Board. In doing so, there was no due process violation.

This is not a case where a person or agency has assumed the roles of both prosecutor and adjudicator. Such a commingling of roles presents "[a] more serious problem," because "[b]y definition, an advocate is a partisan for a particular client or point of view. The role is inconsistent with true objectivity, a constitutionally necessary characteristic of an adjudicator." *Botsko v. Davenport Civ. Rights Comm'n*, 774 N.W.2d 841, 849-50 (Iowa, 2009) *quoting Howitt v. Superior Court*, 3 Cal. Rptr. 2d 196, 202 (Cal. App., 1992). *See also* Asimow, *When the Curtain Falls: Separation of Functions in the Federal Administrative Agencies*, 81 Colum. L. Rev. 759, 773 (1981).

In short, the court finds no merit to the argument that the multiple roles served by the AAGs created an intolerable risk of bias against Dr. Kippax.

B. ***Dr. MacCarthy and Dr. Zajkowski***

Dr. Kippax contends that the role of Dr. MacCarthy as the expert witness for the prosecution of Patient A's compliant was prejudicial to him for a couple of reasons. First, he asserts that because two Board members referred patients to Dr. McCarthy's practice, they should have recused themselves from sitting on the case because "they were pre-disposed to believe an individual on whose expertise they

routinely rely." *Pet's Mem at 14.* Second, Dr. Kippax contends that the reasoning of *Moore v. Maine Board of Dental Examiners*, 2008 Me. Super. LEXIS 152 (Jabar, J.) (April 18, 2008) should apply here because of Dr. MacCarthy's business relationship with Dr. Zajkowski, a recused Board member who acted as the complaint officer for Patient A's complaint.

The court is not persuaded that referring patients to the practice of Drs. MacCarthy and Zajkowski created any risk that the Board members would be biased against Dr. Kippax. Both Board members explained that they referred patients to Dr. MacCarthy's practice, but there was no formal arrangement, it was not exclusive and it involved no compensation of any kind. They also affirmed that the fact that they made referrals to Dr. MacCarthy's practice would not affect their ability to fairly and impartially evaluate the evidence and his testimony. Those Board members enjoy a presumption of honesty and integrity when they serve as adjudicators. *Withrow v. Larkin,* 421 U.S. at 47. *See also Beal v. Town of Stockton Springs,* 2017 ME 6, ¶ 19, 153 A.3d 768. The fact that they made referrals to Dr. MacCarthy's practice, as part of their treatment of their own patients, does not overcome that presumption.

The question of potential bias because Dr. MacCarthy was a practice partner with Dr. Zajkowski, requires an examination of Justice Jabar's decision in *Moore.* In that case, a patient sought a second opinion from an oral surgeon who was, at the time, a member of the Dental Board. He recommended that the patient file a complaint against her first dentist, Dr. Moore, and the patient did so. In her complaint, the patient detailed her discussions with the board member, "informing thereby the entire Board of his recommendation." *Decision at 2.* The board member was then called as an expert witness at the hearing by the AAG presenting the case to the Dental Board sitting as an adjudicatory body.

Justice Jabar recognized that "[a] combination of investigative and adjudicatory functions in administrative proceedings generally does not violate due process absent some further showing of bias or risk of bias." *Decision at 3 citing Zegel,* 2004 ME 31, ¶ 16, n. 3 and *Withrow v. Larkin.* Nevertheless, the court pointed to dictum in *Gashgai* for the proposition that "the combination of investigator, prosecutor and sitting *member of the adjudicatory panel,* even if ostensibly a nonparticipating member, creates an intolerably high risk of unfairness." *Id.* (emphasis in the original). The court concluded that, even though the board member

> . . . was not himself the investigator or prosecutor, his role as a sitting board member combined with his pre-complaint treatment of [the patient], his role in advising [the patient] to file a complaint, his expressed opinions of the efficacy of the complaint as seen by the Board, and his designation as an expert witness in front of the Board on which he sat, combine to create an intolerable risk of bias or unfairness.

*2008 Me. Super. LEXIS 152, \*6.*

In *Zegel v. Bd. of Soc. Worker Licensure,* 2004 ME 37, 843 A.2d 18, the board presented one of its own members as an expert witness at the adjudicatory hearing. The board member had been involved in the case at an earlier stage when it was being investigated, and did not sit on the board at the hearing. Although the Law Court observed that "[a]n administrative process may be infirm if it creates an intolerable risk of bias and unfair advantage," it found that any error was harmless because the experts for each side testified consistently. 2004 ME 31, ¶ 16 *citing Gashgai v. Bd. of Registration in Med.,* 390 A.2d 1080, 1082, n.1 (Me. 1978).

In this case, Dr. Zajkowski did not treat the complaining patient, as the Board member did in *Moore.* He did not encourage her to lodge a complaint with the Dental Board, as the Board member in *Moore* did. He did not testify before the Board as an expert witness, as the Board member did in *Moore*[2]. Rather, Dr.

---

[2] Ironically, Dr. Zajkowski testified in the *Moore* case as an expert witness for the licensee. 2008 Me. Super. LEXIS 152, \*7, n. 3.

Zajkowski acted as the complaint officer on Patient A's complaint and recused himself from participation as a Board member on the case. His practice partner, Dr. MacCarthy, became the expert witness. Dr. Kippax claims that these facts are essentially identical to *Moore* because "it is unavoidable that the Board likely imputed their understanding of Dr. Zajkowski's credibility and competence to his business partner." *Pet's Memo at 18.*

The argument that Dr. MacCarthy's role as an expert witness created an "intolerably high" risk of unfairness assumes that the Board would inevitably and automatically treat Dr. MacCarthy as if he were Dr. Zajkowski. But that assumption is speculative at best. An examination of the Board's questioning of both Dr. MacCarthy and Dr. Lieblich, as well as the Board's actual deliberations, reveals that it did not dismiss Dr. Lieblich's testimony, nor did it unquestioningly accept Dr. MacCarthy's. Rather, the Board focused on the critical issue before it, namely, whether Dr. Kippax's aggressive removal of Patient A's mucocele with enough surrounding tissue to cause an obvious facial deformity, amounted to a violation of the duty of care he owed to his patient.

On this record, the court is not persuaded that Dr. MacCarthy's testimony as an expert witness created an intolerable risk of prejudice and unfairness to Dr. Kippax.

## C. *Prior Board actions involving Dr. Kippax*

Dr. Kippax maintains that prior actions between him and the Board (in which he was "exonerated") essentially created a context of bias against him. He has referred the court to two matters involving him in KEN-AP-17-11 and KEN-AP-18-19, and has asked the court to take judicial notice of those proceedings as showing the "substantial context to the biasing effect of the Board's and its Executive Director's, conduct in those prior proceedings as manifest in the current case." *Pet's*

*Memo at 20, n. 2.* The court has, in fact, looked at those files and did not find anything in them that was relevant or pertinent to the issues in this case.

Additionally, Dr. Kippax has argued that one Board member improperly considered prior Board matters involving him. *Pet's Memo at 20.* The court has reviewed the portions of the Board deliberations quoted by Dr. Kippax and finds that the Board member did nothing improper. The transcript at AR at 444 – T at 512-13 did not refer at all to any prior actions involving Dr. Kippax. All the other quoted language occurred after the Board had found violations and were considering the appropriate sanctions.

### 3. **Did the Board utilize the wrong standard of proof?**

Dr. Kippax contends that the Board committed error when it employed the preponderance of the evidence standard of proof, rather than a clear and convincing evidence standard. As both parties have both recognized, the Law Court has not explicitly ruled on this question. One justice of the Superior Court has addressed this issue and concluded that the preponderance of the evidence standard has been the traditional standard for professional disciplinary cases. *See Bd. of Licensure in Med. V. Diering*, 2008 Me. Super. LEXIS 226, *8 (December 5, 2008) (Mills, J.) *citing Bd. of Overseers of the Bar v. Lefebvre*, 1998 ME 24. ¶ 14, 707 A.2d 69, 73.

Courts in other jurisdictions appear to be split on the issue, with the majority of states using the preponderance of evidence standard in physician disciplinary cases. *See Jones v. Conn. Med. Examining Bd.*, 72 A.3d 1034, 1040-41 (Conn. 2013) (collecting cases). A minority of states have adopted the clear and convincing standard of proof. *See, e.g., Nguyen v. Dep't of Health*, 29 P.3d 689 (Wn. 2001).

In considering this question, the courts have approached it from the standpoint of what is required as a matter of due process and have analyzed it using the three-part test of *Matthews v. Eldridge*, 424 U.S. 319 (1976), namely, (1) the private interest at stake, (2) the risk of erroneous deprivation and the probative value of

additional safeguards, and (3) the governmental interest. The majority view recognizes the important private interest involved in a professional's license to practice, but does not place that interest in the same category as cases in which the clear and convincing evidence standard has been required, such as civil commitment proceedings or the termination of parental rights. *See Addington v. Texas*, 441 U.S. 418 (1979) and *Santosky v. Kramer*, 455 U.S. 745 (1982). Several of the courts that have upheld the preponderance of the evidence standard have pointed to the United State Supreme Court's decision in *Steadman v. SEC*, 450 U.S. 91 (1981) as recognizing that the clear and convincing evidence standard is not required in a proceeding to revoke a license to practice a profession. *In re Polk*, 449 A.2d 7 (N.J. 1981); *Jones v. Conn. Med. Examining Bd.*, 72 A.3d at 1042.

Regarding the risk of erroneous deprivation, the majority of states have concluded that the administrative procedures for adjudicatory hearings are adequate to protect against an unacceptable risk of error.

Finally, regarding the governmental interest, the majority position highlights the important state interest in protecting the public from incompetent practitioners.

The court agrees with the majority view and the decision rendered by Justice Mills in *Diering,* and concludes that the Board did not err by utilizing the preponderance of the evidence standard of proof.

### 4. Did the Board commit error by re-opening its deliberations on sanctions?

During its original deliberations regarding sanctions on October 11, 2019, there seemed to be a consensus among the Board members that a financial assessment against Dr. Kippax was not warranted. *(AR at 454 – T at 549 (Morse & Ray); T at 550 (Davis)).* When the Board re-opened its deliberations on March 13, 2020, however, it decided to assess the cost of the hearing/investigation up to a maximum of $6,000. This appears to have been done primarily for the sake of

consistency. *(AR at 517 – T at 9-10).* It also appears from the record that the reason the Board wanted to re-open its deliberations on sanctions was because most Board members felt exhausted after the 14-hour hearing held on October 11, 2019.

Also during its original deliberations on sanctions, the Board discussed the feasibility of having Dr. Kippax be subject to a practice monitor. This line of discussion was abandoned when the Board members recognized the impracticality of having another oral surgeon serve as a monitor. *(AR at 456).* When the Board re-opened its deliberations on March 13, 2020, one of the Board members (Jowett) again brought up the subject of a practice monitor and the feasibility of that idea was also discussed by the Board.

The concern expressed by several Board members was that Dr. Kippax's reaction, or lack thereof, to the result of his surgical treatment of Patient A, appeared to show an absence of empathy or understanding of what his actions had caused. Ultimately, the Board wanted the Licensee to better appreciate the seriousness and consequences of his conduct, without closing his practice or setting him up for failure in the future. *(A at 519).* This led to the Board's decision to require Dr. Kippax to undergo a MMPHP behavioral assessment. *(AR at 519).*

Dr. Kippax contends that the imposition of the cost of the hearing was an abuse of discretion, in light of his testimony as to his ability to pay. Further, he claims that the requirement of a behavioral assessment was not supported by the evidence.

By statute, 10 M.R.S. § 8003-D, the Board is authorized to "assess the licensed person . . . for all or part of the actual expenses incurred by the board or its agents for investigations and enforcement duties performed." In *Zegel v. Bd. of Soc. Worker Licensure*, 2004 ME 31, ¶ 19, 843 A.2d 18, the Law Court held that a board had not exercised reasonable discretion in assessing costs against a licensed person pursuant

to section 8003-D because it did not determine whether the licensed person had any capacity to pay the additional costs.

Here, the Board heard testimony from Dr. Kippax about his financial liabilities and his ability to pay, and the Board originally concluded that he imposition of costs was not warranted, and it does not appear from the record that the Board made any finding as to the ability to pay. Rather, it appears to the court that it its original consideration of the issue the Board members did not believe the imposition of a financial assessment would serve any purpose. Later, during its re-opened deliberations, the Board voted to assess costs, apparently solely on the basis that it needed to be consistent with past practice.

The court finds that the Board did not exercise reasonable discretion when it imposed actual costs up to $6,000 without any consideration of the License's ability to pay. Based on this record, there was evidence presented to the Board regarding the Licensee's ability to pay, but the Board appears not to have considered that evidence when it assessed costs in order to be consistent with past practice. The Respondent's suggestion that *Zegel* should be overturned is not within this court's authority.

Finally, with respect to the Board's decision to require Dr. Kippax to undergo a behavioral assessment, the court finds that, based on the testimony of both Patient A and the Licensee himself, there was competent evidence in the record to support that requirement.

## CONCLUSION

The entry is:

The Petition for Judicial Review is DENIED and the Decision of the Maine Board of Dental Practice is AFFIRMED, EXCEPT that the Board's imposition of costs up to a maximum of $6,000 is vacated and the matter is remanded to the Board with instructions to consider and determine the Licensee's ability to pay.

The clerk is directed to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

Date: June 9, 2021

William R. Stokes
Justice, Superior Court

Entered on the docket 6/9/2021

Date Filed:4/8/20  *murbc# w*  Kennebec  *6/9/u*  Docket No.AP-20-17  **F**

County

~~J. Murphy~~ recused
**J. Stokes**

Action: 80C

Dr. Jan Kippax                    vs                    Maine Board of Dental Practice

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| James Belleau, Esq. <br> Adam Lee, Esq. <br> 10 Minot Avenue <br> Auburn, ME 04240 | Andrew Black, AAG <br> 6 State House Station <br> Augusta, ME 04333 |

Date of Entry

| | |
|---|---|
| 04/13/20 | Petition for Review of Final Agency Action, filed (4/8/20). s/Belleau, Esq. |
| 04/23/20 | ENTRY OF APPEARANCE, filed (04/21/20) s/Black, AAG |
| 06/25/20 | RECORD, filed. s/Black, AAG <br> Board of Dental Practice Certification of Record of Proceedings with Exhibit. |
| 06/29/20 | Notice & Briefing Schedule Issued. <br> Notice to parties/Counsel. |
| 08/05/20 | Petitioner's Brief, filed. s/Belleau, Esq |
| 09/04/20 | Respondent's Brief in Opposition to Rule 80C Appeal, filed. s/Black, AAG |
| 09/17/20 | Petitioner's Reply Brief, filed. s/Belleau, Esq. |
| 09/29/20 | Letter, filed. (09/28/20) s/Black, AAG <br> This letter is to inform the Court of a potential conflict of which it may not be aware. |
| 09/28/20 | Letter, filed. s/Belleau, Esq <br> Dr Kippax has no objection to Justice Murphy hearing the case based on the issues <br> Raised in Attorney Black's letter. |
| 10/13/20 | NOTICE OF HEARING. <br> Telephonic Conference scheduled for October 15, 2020 at 10:00. <br> Notice of Hearing sent to counsel. |
| 10/15/20 | Hearing HELD. Murphy, J |
| 10/15/20 | ORDER, Murphy, J <br> Justice Murphy is recused from AP-20-17. Attorneys for Dr Kippax in AP-17-11. <br> Will be filing motion to lift stay in that matter and AAG's will be filing motion to <br> Dismiss. Motions will be opposed in the ordinary course. J Murphy will then decide <br> If recusal is necessary in that matter as well. <br> Justice Stokes assigned |

Page  1        AP-20-17